Good morning, Your Honor. Good morning, Your Honors. John Heenan on behalf of Mr. Stuker. I would ask the Court to reserve five minutes to respond to the government's argument. Mr. Stuker obviously cares very much about how this Court's decision comes down, and I'm here on his behalf and advocating on his behalf. But I would respectfully submit to this Court that this Court's decision ought to matter just as much to Detective Schillinger. And to Detective Schillinger, Your Honor, the law enforcement officer who took this young child's statement. And as the Court will recall, this child was kind of sandwiched in the front seat of a police vehicle with a law enforcement officer driving. His mother in between him and Detective Schillinger in the back seat of the vehicle. Detective Schillinger took out his BlackBerry phone that showed my client, Mr. Stuker, approximately one inch. And he held it in Laverico's face, the victim's, or the child's face, excuse me, while they're going down the road. And he doesn't tell the child whether or not these may be the suspects. He just shows them three pictures. And one's my client, and one's my client's brother, and the other's a Hispanic gentleman with a mustache. The kid basically says these people on the phone are the people who threatened my father. Is that basically it? That's right, Your Honor.  The father did testify, Your Honor. Let's just say for the sake of discussion, we throw out what the kid says. We have the father who was actually there, had face-to-face meeting with these people and knows them. Why wouldn't, even if you're right, why wouldn't this be harmless? This case is kind of, this case, I think, can't go down the harmless error route. I know that to be the case. Well, the father knows those people, too. Yes, Your Honor. Right. But, I mean, when you identify, when you're challenging a lineup, isn't inherent to the challenge whether, you know, you don't want it to be overly suggestive so that the identification is wrong. That's right. So isn't it relevant that the father also testified and the father knows these people? Well... And also the statements that your client made, which don't directly admit that he was there, but... So I would say to that question, there's four things. One is we presented alibi evidence. There was witnesses that testified that my client was 50 miles away that day without access to a motor vehicle. The second thing is Mr. Bossack, the victim, was known to Stuker. They were all in the same neighborhood. They were all kind of running around doing the same nefarious things. And Mr. Bossack had incredible credibility problems. I think, very candidly, there's no way the government would have brought the case based solely on Mr. Bossack's testimony. He had three prior times where he had been convicted of lying to law enforcement officers. He had smoked marijuana that day, just like every other day. And DFS was at the house. He had all kinds of credibility problems. Third, even with this child's testimony, I sat there for two whole days, over 10 hours, while the jury deliberated. But there were two defendants, and they ended up acquitting the other one. So this is not your ordinary case where you have one defendant and they take two days to convict. Well, Your Honor, I guess that would be my fourth and I think most important part about the harmless error analysis. After that 10 hours, I went back to the holding cell and I said, Mr. Swan, on the same exact evidence, I mean, it was exactly the same evidence, the boy and Bossack pinned Stuker and Swan, all the evidence was the same. It wasn't exactly the same because Swan was in somewhat of a different position relative to what was going on. I mean, the testimony wasn't exactly the same as to each one of them. The testimony from Bossack and the child were both that Swan and Stuker were there. Both identified Swan and Stuker's photographs and pointed to them. I know, but was the testimony the same that they did the same thing? Because Swan could have been there. Just being there doesn't make you guilty of the crimes that you're charged with because there were elements and obviously the jury could believe that Swan was there but didn't believe he did what, you know, that his culpability was different than his brother's. Well, the evidence that was presented, Your Honor, was that both Bossack and this child said they saw Swan with a gun in his waistband. And my comment going back to the harmless error was I told both these brothers, Swan, you're free to go. Stuker, you were found guilty. And no one has an explanation. And I would certainly not try to suggest to the court or tell the court what the jury's thought process was. All I know is it took them a long time, and they certainly heard the same evidence of Swan's guilt and for whatever reason let Swan go. Well, it seems to me pretty obvious that if I'm looking at this case deciding whether I've got witness intimidation, I see Stuker or the testimony is that Stuker had a gun that he held and pointed at the father. Swan has a gun in his waistband. He lifts up his shirt to show it. Both of those seem to me to be intimidation. But it's at least plausible that the jury thought, you know, okay, we're going to go after the guy who's actually pointing the gun and we'll let the other guy slide. That sounds like jury nullification as to Swan, frankly, but there it is. Well, and the other thing, Your Honors, at some point I think on the second day of deliberations, the jury sent out a note and they wanted to see the picture of Stuker and whether he had the tail in his picture. And so, again, I'm not going to pretend or suggest that I know what the jury was thinking, but I think it brings us back to these exact issues for why we're here, and that's the fact that they put this picture in this young child's face, and that cemented for him that it was the picture that he remembered, not even necessarily the incident or that my client was there to threaten. And I know that this Court reads a ton of papers and briefs and looks at words and listens to argument, but I would just, I would ask this Court, please, before it renders its decision in this case, open up any door in your home, in your office, open it up wide enough, not just to put your head through, but your whole shoulders, and then come around. I'm from Phoenix and we did that on Friday in my office. Thank you. And you can see through the crack in the door. You know, at least I could. How much could you say? I mean, and not only that, but they had a photograph in evidence of what the field of vision was. So, I mean, isn't this something the jury could have accepted or rejected? Well, if the jury would have been allowed to go to the apartment and look through the crack in the door as we asked the Court, then I think absolutely, Your Honor. You know, that's a pretty big crack. Yes. But when you put your eye up to the crack, any crack, I would suggest that your eyes are open. It's not the same as standing in an open room here. No, but everybody knows that. But everybody knows you can look through a crack and see. You can look through a keyhole. You can look through a knot in a fence. I mean, this is common knowledge. Absolutely, Your Honor. And I wouldn't suggest otherwise. You wanted to reserve some time and you have. There's, yeah, there's seven minutes there. I'd be happy to answer some more questions now or otherwise I'll reserve until the end, please. Okay. Thank you. Thank you. Morning, Your Honors. May it please the Court. Brian Whitaker for the United States. Morning. Government would ask that this Court affirm the district court's order that did not suppress the identification or the young man's testimony. We believe, as Judge Silverman and you indicated, that this, even if it was suggestive, which we don't say that it was at all, but even if it was, that this was harmless. You don't say it's suggestive? He shows them three pictures, two of which of the guys? No, I don't. It's not suggestive, Your Honor. And the reason why is that. This were an ordinary lineup, not a situation in which the defendants are actually known to the father, but it was a sort of a stranger crime. This would not be a bad lineup? The reasons why this wasn't a bad lineup in this case, and I would say, no, it's not a bad lineup in this case for these reasons, it's because they didn't ask or tell the kid that he had to identify anybody in there. They asked him if he recognized anybody. They didn't tell him that any of those people were the suspects. They didn't praise him after he identified him. I got all of that. The only word I'm quarreling with is your statement that it's not suggestive. It does seem to me that it's suggestive. And I think that's the reason why it's not suggestive.   I think it's suggestive because it's a case where, anytime you've got a police officer showing to, I think an 11-year-old boy, is that his age? He was 10 or 11 at the time, yes. An 11-year-old boy, three pictures, two of whom are the suspects, there is a suggestion there. It may not be fatal to your case, but it strikes me as suggestive. Well, I guess according to the, I mean, even in the Supreme Court case where they brought the one defendant to the lady in the hospital, and because of the exigent circumstances, they said that was okay to bring the suspect to the lady in the hospital. I mean, is it somewhat suggestive? Yes. But the exigent that you say here is what, like three weeks after the incident, right? It was three weeks after. That's right. I mean, the exigency that you claim is that it's apparently comes to law enforcement's attention that there's a trial starting the following week and that someone's threatening witnesses that are coming to court and, you know, so that they get all up in this witness tampering. And so the exigency is not really the same as when, say, an incident's just happened and you put someone by a police car or you do a show-up or something like that. There's three weeks have gone by. That's correct that three weeks have gone by. They found out on July 22nd, the law enforcement did, about the incident. That afternoon was when they had the boy in the car. That's when the identification occurred. The trial was to occur, Mr. Lira's trial was to occur on July 25th, which was two and a half or three days later. That morning, law enforcement, according to the record, had learned of two or three other witnesses that had been intimidated. So this is the situation where they're faced within a couple of days there to go to trial on this case. This is a significant threat where somebody comes and sticks a gun in somebody's face and tells them they shouldn't testify. Law enforcement's looking at this saying, we've got to get this guy off the street. And, in fact, that FBI task force officer said it was their intent to try to make an arrest that afternoon, that day, if they could, because they're just learning of this. And the trial's three days later. The victim witness personnel in this case, the record says that they were trying to find emergency funding to try to move these witnesses to secure their safety. I think everybody's thinking this is an important thing. We've got to protect people. This is almost like a gangster type of activity in Billings, Montana, which wouldn't occur very often. This is something law enforcement is taking very seriously, trying to protect any potential harm to witnesses. So is it the same, Judge Callahan, as just happening right then, they bring the guy to the police window and do the identification? No, it's a little bit different. But the threat, the risk of harm to individuals is certainly significant. And so there is some agency in trying to protect those victims. So Bostick testifies at trial, and he knows the people, right? Say that again? Bostick testifies at trial, and he knows these guys. Yes, that's what he says. He knows them from before. I guess it's also at trial that it comes to pass that these people have had a prior road rage. Yes, that's correct. That's correct. They had the prior road rage. I don't remember if it was a year or two years before, but it was sometime before that. The family was there together, these same individuals, Mr. Stuker being one of them. There was this road rage, and there was a gun pulled. The facts exactly aren't clear on how that went down, but there was a gun involved. Mr. Stuker was involved. I think the appellant's counsel suggests that the mother was standing by to cement his identification, that the young boy's identification. What's your response to that? Say that again? The mother did what? Was standing by to cement his identification. That contributes to the suggestiveness, I think, according to the appellant's counsel. That's correct. The mother was there in the front seat, apparently, and she asked after the boy identified the defendant and his brother, the mother said, well, can I see who it was so that if these guys show up, I know who to look for? I think that's what the record said that she wanted to know. And so the task force officer did show her the pictures. I don't remember that she said. Your position would be it was after that it had no influence on what the young boy did when he was looking at the pictures? Yes. And the mother asked to see them for her information to be on the lookout, essentially, for if these guys showed up again wherever they were being moved to so she would know who do I call the police? If these people show up on my doorstep, do I call the police? Do I not open the door? That kind of thing. Well, the young man, when he identified both of them as being the people at the door, he didn't until later say that, oh, yeah, those people were in the road rage, too. That's right. Initially he couldn't remember that. That's true. He couldn't remember. Then his mother, I think, identified them as being the ones in the road rage, and then he said, yeah, I remember that. So that's correct that he remembered the road rage incident later. The one point that I want to make about the suggestiveness, though, is that we balance that against the reliability of identification. The Supreme Court said that's the linchpin is the reliability, and that's what we look at. And in this case, I would submit that the reliability of his identification was really, really good. He talked about, well, there are several factors that the Supreme Court said we look at, and it's the opportunity to view the crime as it occurs. And in this case, we talked about that with the door, the crack in the door. Mr. Bostic said that the door was fully open, that the little boy said he looked through the crack, he could see through the crack. What do we make of the fact that the little boy doesn't say the door was fully open? He says it was open like my dad could basically kind of stick his head out. Am I right? I don't remember that exactly. I think there was some conflict in the testimony as to how wide the door was, how wide open the door was. Okay. I don't remember that. I know that Mr. Bostic said in my notes that the door was fully open. Yeah, that was his testimony. Yeah. And so the little boy, there was a little bit of conflict there. The little boy said that he could see for a short time, maybe five minutes. Mr. Bostic said three to five minutes. Anyway, so there's a little bit of fact. But I don't think that's the reason that we would suppress it. That's the reason why you cross-examine the boy on the stand and let the jury decide whether he is credible or not. Now, what do we make of Mr. Stucker's statements that he made to the police? Did he admit being there, or did he – what exactly did he say to the police about his whereabouts? He doesn't exactly admit he was there for the incident, right? And he puts on an alibi defense, but he does make some – I don't remember exactly the statement that he made. But I don't know that that necessarily plays into the reliability and the suggestiveness of the identification. It may play into the harmlessness of the boy being allowed to testify that Mr. Bostic – there's stronger evidence that this case would have resulted in the same outcome, regardless of whether the boy was there. But when this little boy – when we talk about the reliability of it as well, his attention to detail was actually pretty good. That's one of the factors we look at. He talked about Mr. Stucker having the ponytail. He talked about that they were wearing a sweater with a hood. They were wearing jeans. The hoods weren't up. They didn't have a baseball hat on. He says he remembers them talking in mean voices, not loud or screaming, but in mean voices. And then the certainty of his identification, he's certain that he identifies them when he sees the pictures. He identifies them in court. The district judge asked the little boy – not the little boy, I'm sorry, the FBI task force officer how certain was he. And the FBI task force officer said there was no question in his mind whatsoever. He was quite certain of who these people were. And then the timing of the identification, there was a three-week delay from the time, but it's not too long. I mean, there's been cases that it's been over a year and identification was still valid. So it's still a relatively short period of time. When we take all those factors together as the reliability, it far outweighs any suggestiveness if there was any at all, which we don't concede that. But the reliability in this case is good, and we should not suppress the testimony. And we would ask that the Court would affirm. Thank you. Thank you, Mr. Whitaker. Mr. Heenan, back to you. You've got about seven minutes and change. Thank you, Your Honor. I'll try not to use it just because I have it. A couple points. The case that we relied on heavily with respect to cementing the child witness's testimony, in that case it was law enforcement kind of telling the boy, awesome job. Well, here it's not law enforcement saying, great job, buddy, but they show it to Mom, who's right next to him in the car, and she says, oh, yeah, I remember those guys, in front of this child. And so it's the same, it's a different person doing it. She asked to see them. She wanted to be able to. But I think that he, I think counsel for the appellate of the government did correctly state the reason she wanted to look at them was since it was a threat situation, she wanted to make sure, okay, if these people come back, a knock-in, I want to know who they, you know, I want to know whether, you know, what to do, right? I mean, she didn't, she's not identifying them for the incident. Yeah, I'm not suggesting any kind of ulterior motive from this woman to try and, you know, create admissibility doubt. But she's not supporting his identification of them on the incident in question. When she looks at them, she's saying, I want to know who these people are to protect my family. She looks and she says, I've seen these guys before. We had an incident, right? Yeah, and the incident, Your Honor, related to my client really putting a BB gun or something at BOSIC in a different situation six months before the split. Did your client deny that incident? No. No, Your Honor. So she wasn't wrong that there had been a prior incident. She wasn't wrong at all. But what I think really happened is that young child, under those circumstances, those memories completely kind of melded because mom. Well, let me say hypothetically, would that have been more significant if she had done that before he identified them? I think under any circumstance, in that young boy's mind. Well, but, okay, I'm not asking you to give up your argument, but you'd have a better argument if she'd done that right before he identified them, wouldn't she? Sure. If she got to see the pictures first, Your Honor, I think that would be a better argument. And with him sitting there saying, oh, I remember these people from a road rage. Yeah. But as I understand the whole point of not creating a suggestive atmosphere for a witness identification, it's not letting them know so that you can find out how certain you are or how certain the person is of who they're identifying. Well, here, and I'd like to talk about those factors because this indicia of reliability, I think every one of those five factors goes our way. No one asked this child what these people looked like before they put the picture in his face. He had never had any opportunity to say what nationality or ethnicity was he, how tall was he, did he have facial hair, did he have a ponytail. And then so that creates a problem down the road. By the time this boy's testifying, well, he remembers in great detail the picture that the government has showed him over and over and over, and the evidence is undisputed that they brought this boy in to grand jury four weeks after and he couldn't remember, and the prosecutor had to kind of nudge him along and say, well, is that one of the people you saw through the crack? Oh, yeah. Thank you. And, of course, Mr. Stuker wasn't there at the grand jury. And by the time I got to cross-examine this child, which is no fun to cross-examine a child and try and point out these problems, but by the time I cross-examined him, it was like he was reading a script. He had practiced, practiced, practiced so much with the government. They had brought him into the courtroom. They had gone through what his job was. And so to me that proves the whole point about this is a due process case. It's about Stuker, but it's not. It's about Detective Schillinger. It's about the other 2,500 state law enforcement officers who know the rules under state law like Detective Schillinger did. I mean, to me that's kind of the most striking part about this case. He knew exactly how to do a proper photo array. He knew how to not create suggestive identification. He just decided because he was wearing his federal task force hat, he didn't know what the rules were and he didn't care what the rules were. And so that brings me back to the point I was trying to express when I started talking. This case obviously affects Mr. Stuker, but I think more importantly, really more importantly, Your Honor's decision sends a message loud and clear to law enforcement one way or the other, because if we're just going to let the exceptions be bigger than the rule, then it's a wink, wink. And all law enforcement knows, you don't really need to do a photo array. You don't need to really follow the rules. We'll just say harmless error. We'll just say indicious reliability. And those factors aren't present here. This wasn't a case where there was five nuns lined up to testify against my client and it's harmless error. It was really close. And I think if you would have been clear. Roberts. You know, this may not help your client. And I'm now speaking for myself because we don't consult on these argued cases ahead of time. So I don't know quite what they're going to think on this. But the way I react to this case is that this was an impermissible array, but it's harmless. But it's harmless in the context of this not being a stranger crime. If this were a stranger crime, I would feel very differently about it. But this is a crime in which the father knew these people. He not only had the road rage, but apparently they hang around together in the neighborhood. So this is not a stranger crime for which we're using the array. If we'd used this array identifying a stranger who had been one of these fleeting people, you know, he shot at us and then he ran away, I would feel very differently about this case. I would respectfully say, Your Honor, that that goes back to what I think really happened here. I think that boy remembered my client having a road rage incident, doing some of the same bad stuff, and I'm not here to try and pretend otherwise. But those would have been State court charges. Those would have been a different crime. It wasn't this crime of witness tampering. And in that young man's mind, because of the way this all went down and because of the way that my client's due process was abused, it wasn't harmless. He was convicted because they were allowed to bring in a child witness who had been so coached up by that point to remember and identify my client through the photograph that they'd been showing him for a year that his fate was sealed. And even after all that, my client almost was acquitted. It was really close. And his brother, on the same evidence, and maybe one was holding a gun and one was ---- but on the same evidence, Your Honors, one brother went home. I see him all the time in Billings. The other one's due in 200 months in Federal prison. Well, I think you're sort of overstating that it was almost, because 12 people still had to find your client guilty, right? Absolutely, Your Honor. So almost isn't really exactly ---- I would ---- Almost counts in horseshoes and hand grenades, you know. It might be that Mr. Swan was almost convicted. My only point, Your Honor, is I've been a part of some verdicts where it takes the jury about three minutes. You know, you wonder if they're going to eat lunch, and no one even wants to eat lunch, so that's ---- Thank you. I see you're out of time. Thank you, Your Honors. The case just argued is just a bit ----
judges: Silverman, Fletcher, Callahan